1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE HARBOR LAW GROUP**
Kira M. Rubel (WSBA No. 51691)
kira@theharborlawgroup.com
3615 Harborview Dr., Suite C
Gig Harbor, WA 98332

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis (FL Bar No. 101754)*
ashamis@shamisgentile.com
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)*
*jkaliel@kalielpllc.com*
Sophia Goren Gold (CA Bar No. 307971)*
*sgold@kalielgold.com*
1100 15th Street NW, 4th Floor
Washington, D.C.  20005
Tel: (202) 350-4783

**EDELSBERG LAW, PA**
Scott Edelsberg (FL Bar No. 100537)*
scott@edelsberglaw.com
20900 NE 30th Ave Ste 417
Aventura, FL 33180
Tel: 305-975-3320

*Pro Hac Vice forthcoming*
*Attorneys for Plaintiff and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| **ROBERT ARANT,** individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**BOEING EMPLOYEES' CREDIT UNION,**<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Arant, individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Defendant Boeing Employees' Credit Union ("BECU," "Bank," or "Defendant") and alleges as follows:

## INTRODUCTION

1.     This lawsuit is brought as a class action on behalf of Plaintiff and thousands of similarly situated customers of BECU who have signed up for the Zelle money transfer service and who: have been the victim of fraud on the Zelle service; who have incurred losses due to that fraud that have not been reimbursed by BECU; and who were entitled by the marketing representations of BECU regarding the Zelle service and by the BECU's contract promises to a full reimbursement of losses caused by fraud on the Zelle service.

2.     Zelle is a person-to-person ("P2P") payment transfer service wholly owned and operated by seven of the largest banks in the U.S. Person-to-Person payments allow a consumer to send money to another person without needing to write a check, swipe a physical card, or exchange cash.

3.     There are approximately 1,500 member banks and credit unions who participate in the Zelle service. Those members engage in their own significant marketing efforts to encourage their accountholders to sign up for the Zelle service by marketing Zelle as a fast, safe and secure way for consumers to send money. This is false. In fact, there are huge, undisclosed security risks of using the service that BECU omitted from its marketing push to get its accountholders to sign up for Zelle.

4.     BECU prominently touts Zelle to its accountholders as a secure, free and convenient way to make money transfers. However, it misrepresents and omits a key fact about the service that is unknown to accountholders:  that there is virtually no recourse for consumers to recoup losses due to fraud.  Indeed, unlike virtually every other payment method commonly used by American consumers—debit cards, credit cards, and checks—there is a no protection for accountholders who are victims of fraud, and virtually no recourse for accountholders attempting to recoup losses due to fraud.

5.    The unique, misrepresented, and undisclosed architecture of the Zelle payment system means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection.

6.    Worse, BECU misrepresents and omits the truth about a secret policy it has adopted: it does not and will not reimburse its accountholders for losses via Zelle due to fraud, even where those losses are timely reported by accountholders.

7.    BECU was required not to misrepresent the unique and dangerous features of the Zelle service in its marketing about it and in contractual representations. But it failed to do so.

8.    As a result, users like Plaintiff sign up for and use the Zelle service without the benefit of accurate information regarding that service, and later end up with huge, unreimbursed losses due to fraud. Such users never would have signed up for Zelle in the first place if they had known the extreme risks of signing up for and using the service.

9.    As a member of the Zelle network, the risks are well known to BECU but are omitted from all of its marketing regarding Zelle.

10.    As a recent New York Times investigation showed, fraud on the Zelle network is a widespread scourge of which bank is well aware. Quoting an industry expert, the *Times* reported:

> "Organized crime is rampant," said John Buzzard, Javelin's lead fraud analyst. "A couple years ago, we were just starting to talk about it" on apps like Zelle and Venmo, Mr. Buzzard said. "Now, it's common and everywhere."

> The banks are aware of the widespread fraud on Zelle. When Mr. Faunce called [his bank] to report the crime, the customer service representative told him, "A lot of people are getting scammed on Zelle this way." Getting ripped off for $500 was "actually really good," Mr. Faunce said the rep told him, because "many people were getting hit for thousands of dollars."

https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last accessed March 28, 2022).

CLASS ACTION COMPLAINT -3-

11.    Had Plaintiff and the Class members known of the true operation and risks of the Zelle service—risks BECU alone was aware of and actively misrepresented—they would not have signed up for and used the Zelle service.

12.    Plaintiff and the Class members have been injured by signing up for and using the Zelle service. Plaintiff brings this action on behalf of himself, the putative Class, and the general public. Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent Boeing Employees' Credit Union and Zelle from continuing to engage in its illegal practices as described herein.

## PARTIES

13.    Plaintiff Robert Arant is a citizen and resident of Des Moines, Washington, and a member of BECU.

14.    Defendant Boeing Employees' Credit Union, is a Washington credit union headquartered in Tukwila, Washington. BECU has a total of 60 branches, 58 of which are in Washington State.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a different State than Defendant. The number of members of the proposed Classes in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

16.    This Court has personal jurisdiction over the Defendant because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persosn in this District.

17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant is subject to personal jurisdiction here and resides in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District. BECU's Account Agreement specifies that its agreements are governed by the laws and

regulations of the State of Washington, and that any disputes regarding its Agreements "must be brought in and are subject to the jurisdiction of a court in King County, Washington."

## FACTUAL ALLEGATIONS

**A.    Overview**

18.    It is free to sign up with Zelle, and in fact Zelle is integrated into the websites and mobile apps of BECU.  In marketing and within the website and app itself, BECU encourages its accountholders to sign up for the Zelle service—a sign up that occurs quickly within the BECU website or mobile app.  During that sign-up process, a user provides basic information to Zelle to link into the Zelle network.

19.    While Zelle provides a link to what it calls a "User Agreement" on its website, at no time during the sign-up process on the bank's website or app did Plaintiff agree to be bound by that document.

20.    Sign up for the Zelle service allows the fast transfer of account funds to other Zelle users.

21.    Created in 2017 by the largest banks in the U.S. to enable instant digital money transfers, Zelle is by far the country's most widely used money transfer service. Last year, people sent $490 billion in immediate payment transfers through Zelle.

22.    The Zelle network is operated by Early Warning Services, a company created and owned by seven banks: Bank of America, Capital One, JPMorgan Chase, PNC, Truist, U.S. Bank and Wells Fargo.

23.    The Zelle service is very popular, but it also has a massive fraud problem—in no small part because of the immediacy with which money transfers are made on the service.  If a fraudster removes money from a Zelle user's bank account, either directly or by fooling the Zelle user to transfer money, those funds are unrecoverable to the consumer.

24.    Nearly 18 million Americans were defrauded through scams involving person-to-person payment apps like Zelle in 2020 alone, according to Javelin Strategy & Research, an industry consultant.

25.     Organized crime is rampant on Zelle and other similar person-to-person transfer services.

26.     The 1,500 banks and credit unions who are members of the Zelle network, including BECU, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take steps to warn their accountholders of these risks—or protect their accountholders who fall prey to fraud.

27.     For example, a common scam involves a scammer impersonating a bank employee and requesting that the accountholder transfer money to a different bank account for testing purposes. Unsuspecting Zelle users, tricked into making a fraudulent transfer, in many cases send hundreds or thousands of dollars to fraudsters.

28.     In another very common scheme, a Zelle user's phone is stolen and Zelle transfers are made from the stolen phone to the fraudster.

29.     In short, and unbeknownst to average Zelle users, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists and those who use social media sites to advertise fake concert tickets and purebred puppies.

30.     Scams like these are rampant on the Zelle network precisely because of the design and architecture of the network, specifically that money transfer is instantaneous and unrecoverable. Indeed, there is virtually no recourse for consumers to recoup losses due to fraud, unlike other payment methods commonly used by American consumers—debit cards, credit cards, and checks. Zelle provides no protection for accountholders who are victims of fraud, and BECU provides virtually no recourse for accountholders attempting to recoup losses due to fraud.

31.     The unique, misrepresented, and undisclosed architecture of the Zelle payment system and BECU's own fraud policies means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection for victimized accountholders.

**B.** **BECU Falsely Markets Zelle as a Safe and Secure Way to Transfer Money, Omits Information Regarding the Extreme Risks of Signing Up for and Using the Service, and Misrepresents Fraud Protections Regarding Zelle in its Account Contract**

32. In its marketing about Zelle and during the Zelle signup process within the Bank's mobile app or website, the Bank makes repeated promises that Zelle is a "fast, **safe** and easy way to send and receive money" (emphasis added).

33. It also promises: "Zelle Send and receive money quickly and **securely** from the BECU app or Online Banking." (emphasis added).

34. At no time in its marketing or during the sign-up process does BECU warn potential users of the true security risks of using the Zelle service—including the risk of fraud and the risk that fraudulent losses will never be reimbursed by BECU.

35. Zelle's services can cause unsuspecting consumers like Plaintiff to incur massive losses on their linked bank accounts.

36. BECU misrepresents (and omits facts about) the true nature, benefits, and risks of the Zelle service, functioning of which means that users are at extreme and undisclosed risk of fraud when using Zelle. Had Plaintiff been adequately informed of these risks, he would not have signed up for or used Zelle.

37. The Bank's marketing representations about Zelle—including within its app and website—misrepresent and never disclose these risks and material facts, instead luring accountholders to sign up for and use the service with promises of ease, safety and security.

38. These representations—which all users view during the sign-up process—are false and contain material omissions.

39. BECU misrepresents the true nature, benefits and risks of the service, which burden users with an extreme and undisclosed risk of Zelle causing losses due to fraud. Plaintiff would not have used Zelle if he had been adequately informed of the risks.

40. The Bank's misrepresentations and omissions are especially pernicious because BECU alone knows a crucial fact regarding Zelle transfers that occur on its accountholders'

accounts:  as a matter of secret bank policy, fraud-induced Zelle transfers will almost never be reimbursed to accountholders.

41.    Indeed, upon information and belief, BECU maintains secret policy whereby it refuses to reimburse fraud losses incurred via Zelle, even where its accountholders timely inform BECU of the fraud.

42.    It misrepresents and fails to disclose this secret policy.

43.    Further, BECU's Account Agreements applicable to consumer accounts repeatedly promises users that, if they timely report fraud, such fraud will be fairly investigated and accountholders will not be liable for fraudulent transfers:

**Loss or Theft of Your Card or Unauthorized Use of Your Account through Electronic Means**

But tell us IMMEDIATELY if you believe that anyone has used your card, PIN, or authorization code or has accessed your Accounts without your authority. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your Account (plus your maximum Line of Credit).
If you tell us within two (2) business days after you learn of the unauthorized use of your Account or card, you can lose no more than fifty dollars ($50) if someone used your Account or card without your permission. If you do NOT tell us within two (2) business days after you learn of the unauthorized use of your Account or card, you could lose as much as five hundred dollars ($500). If you do not tell us within sixty (60) days after the statement showing the unauthorized use of your Account or card was made available to you, you may be liable for all other unauthorized EFT transactions up to the full amount of the loss if we can prove that we could have stopped someone from making the transfers if you had told us within the sixty (60) day period. If extenuating circumstances kept you from telling us, we may, but are not obligated to, extend the time periods at our discretion.

44.    The Bank makes these promises again in its General Terms for BECU Funds Transfer Service:

**Your Liability for Unauthorized Transfers**

Immediately following your discovery of an unauthorized Payment Instruction, you shall contact us in person or call us…
You are responsible for all transfers (debits and credits) you authorize using your password or other means to access your account through which you access the

Service. If you permit, others to use your means of access you are responsible for any transaction they authorized or conduct on any of your accounts. However, tell us AT ONCE if you believe anyone used your means of access or accessed your accounts without your authority. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus your maximum line of credit, if any). You will have no liability for unauthorized transactions if you notify us within sixty (60) days after your monthly financial institution statement that shows the unauthorized transaction has been sent to you. If your account statement shows transactions through the Service that you did not make, tell us AT ONCE. If you do not tell us within 60 days after the statement was made available to you, you may be liable for all other unauthorized transactions up to the full amount of the loss if we can provide that we could have stopped someone from doing the transaction if you had told us in time.

If a good reason (such as a long trip or a hospital stay) prevented you from telling us, we may extend the time periods specified above to a reasonable period.

45.     These provisions are and were reasonably understood by Plaintiff to mean that Plaintiff would not be liable for electronic funds transfers effectuated by fraud.

**C.      BECU Is Required to Follow EFTA Requirements and It Fails to do So**

46.     The Electronic Fund Transfer Act requires banks to reimburse customers for losses on transfers that were "initiated by a person other than the consumer without actual authority to initiate the transfer."[1]

47.     An unauthorized Electronic Fund Transfer ("EFT") is an EFT from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. § 1005.2(m).

48.     Unauthorized EFTs include transfers initiated by a person who obtained a consumer's access device through fraud or robbery and consumer transfers at an ATM that were induced by force. Comment 2(m)-3 and 4.

49.     According to the Consumer Financial Protection Bureau ("CFPB"), "If a consumer has provided timely notice of an error under 12 CFR 1005.11(b)(1) and the financial institution

---

[1] Electronic Fund Transfers FAQ, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/#unauthorized-eft (last accessed June 6, 2022).

determines that the error was an unauthorized EFT, the liability protections in Regulation E section 1005.6 would apply."[2]

50.     Recent CFPB guidance on unauthorized EFTs indicates P2P payments are EFTs, such as transactions made with Zelle, and trigger "error resolution obligations" to consumers to protect them from situations where they are fraudulently induced to initiate an unauthorized EFT from a third-party.[3]

51.     The CFPB has made it clear that a transaction that is fraudulently induced by a third party is an unauthorized electronic funds transfer subject to the limitations of liability in 12 C.F.R. § 1005.6.[4]

52.     Even so, Defendant has not reversed or refunded all funds of Plaintiff's disputed and unauthorized transactions, though obligated to do so.

53.     Because banks, such as Defendant, fail to protect consumers as widespread "fraud flourishes" on Zelle, Senators Elizabeth Warren, Robert Menendez and Jack Reed sent a letter to the CEO of Zelle noting:

> The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act Protected victims of fraudulent money transfers, **including those who were "induced" into transferring the money themselves**, while the FDIC issued a report in March 2022 finding that both the banks and the platform—in this case Zelle—were held responsible for fraudulent electronic transfers through Regulation E.

*See* **Exhibit 1**, Warren Letter to Zelle on Scams and Fraud (emphasis added).

54.     Unfortunately, BECU regularly fails to consider fraudulently induced Zelle transactions as "unauthorized EFTs," thus depriving accountholders of their rights to be reimbursed for such fraudulent transfers, even where the losses are timely reported by consumers.

---

[2] *Id.*
[3] *Id.*
[4] https://www.consumerfinance.gov/rules-policy/regulations/1005/2/ ("An unauthorized EFT includes a transfer initiated by a person who obtained the access device form the consumer through fraud") (last accessed June 6, 2022).

**D.     Plaintiff's Experience**

55.     When Plaintiff signed up for Zelle he was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by users' banks or credit unions.

56.     For example on March 7, 2022, a fraudster transferred $2,000 from Plaintiff's bank account using the Zelle service.

57.     Plaintiff was seeking to purchase kittens from an online breeder. Plaintiff was familiar with purchasing pets online as he found his previous cat from an online breeder.

58.     Plaintiff contacted a fraudster masquerading as a cat breeder through a website purporting to offer two kittens for $2,000 total. The website was professional and well designed.

59.     After, answering Plaintiff's questions about the kittens, the fraudster informed him that payment would be accepted through Zelle.

60.     Plaintiff had never used Zelle before then and had no idea of the rampant fraud on the Zelle network. He downloaded the Zelle app, linked his personal bank account, and proceeded to transfer $2,000 using the Zelle service to the fraudster.

61.     The following day, on March 8, 2022, the fraudster transferred an additional $2,400 from Plaintiff's bank account using the Zelle service.

62.     The fraudster claimed to reside in Tucson, Arizona, so he instructed Plaintiff to transfer an additional $1,400 to pay for "travel expenses" to send the kittens to Plaintiff in Seattle, Washington. Then, the fraudster requested an additional $1,000 to "microchip and vaccinate" the kittens. As instructed, Plaintiff transferred both amounts via Zelle and the fraudster provided him with a purported tracking number for the kittens.

CLASS ACTION COMPLAINT -11-

63.     In total, the fraudster transferred $4,400 from Plaintiff's bank account using the Zelle service over two days.

64.     Soon after, Plaintiff checked the shipping status of the kittens with a tracking number provided by the frauster; the tracking number, however, was invalid. Plaintiff attempted to contact the fraudster for clarification,but the fraudster never responded. At this point, Plaintiff realized he fell victim to fraud.

65.     Plaintiff timely informed BECU of the fraud, but BECU refused to reimburse him for the losses.

## CLASS ALLEGATIONS

66.     Pursuant to Rule 23 of the Federal Rules of Civil Procuedre, Plaintiff brings this action individually and as representatives of all those similarly situated, on behalf of the below-defined Classes:

> All persons with a BECU account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud (the "Class").

> All Washington persons with a BECU account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud (the "Washington Subclass").

67.     Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staffs.

68.     This case is appropriate for class treatment because Plaintiff can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

69.     **Numerosity:** The members of the Classes are so numerous that joinder of all members would be unfeasible and impracticable. The precise membership of the Classes is unknown to Plaintiff at this time; however, it is estimated that the Classes are greater than one

hundred individuals. The identity of such membership is readily ascertainable via inspection of Defendant's books and records or other approved methods. Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

70. **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiff and all other similarly situated persons, which predominate over questions affecting only individual Class members, including, without limitation:

a) Whether Defendant's representations and omissions about the Zelle service are false, misleading, deceptive, or likely to deceive;

b) Whether Defendant failed to disclose the risks of using the Zelle service;

c) Whether Plaintiff and the Class members were damaged by Defendant's conduct;

d) Whether Defendant's actions or inactions violated the consumer protection statute invoked herein;

e) Whether Defendant's actions or inactions violated the EFTA; and

f) Whether Plaintiff is entitled to a preliminary and permanent injunction enjoining Defendant's conduct.

71. **Predominance of Common Questions:** Common questions of law and fact predominate over questions that affect only individual members of the Classes. The common questions of law set forth above are numerous and substantial and stem from Defendant's uniform practices applicable to each individual Class member. As such, these common questions predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

72. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, Plaintiff and all Class members were similarly injured through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiff, like the

members of the Classes, were deprived of monies that rightfully belonged to them. Further, there are no defenses available to Defendant that are unique to Plaintiff.

73.    **Adequacy of Representation:** Plaintiff is an adequate class representative because they are fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Classes, and because their interests do not conflict with the interests of the other Class members they seek to represent. Moreover, Plaintiff's attorneys are ready, willing, and able to fully and adequately represent Plaintiff and the members of the Classes. Plaintiff's attorneys are experienced in complex class action litigation, and they will prosecute this action vigorously.

74.    **Superiority:** The nature of this action and the claims available to Plaintiff and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each Class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by individual Class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual Class members against Defendant, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual Class members which would, as a practical matter, be dispositive of the interests of the other Class members not parties to adjudications or which would substantially impair or impede the ability of the Class members to protect their interests. Further, the claims of the individual members of the Classes are not sufficiently large to warrant

vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

**FIRST CAUSE OF ACTION**

**Violations of Washington's Consumer Protection Act ("CPA")**
**Wash. Rev. Code § 19.86.010, *et seq*.**
**(On behalf of Plaintiff and the Washington Class)**

75.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

76.    The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

77.    Plaintiff and members of the Washington Class are "persons" within the meaning of RCW 19.86.010(1).

78.    Defendant is a "person" within the meaning of RCW 19.86.010(1).

79.    Defendant's common courses of conduct, as alleged herein, are unfair and deceptive and had, and continue to have, the capacity to deceive a substantial portion of the public.

80.    Defendant's common courses of unfair and deceptive conduct occur in trade or commerce and impact the public interest because Defendant's is in the business of providing financial services, including the Zelle electronic money transfer service, to tens of thousands of consumers in Washington. Thousands of Washingtonians have suffered and will continue to suffer injury by Defendant's unfair and deceptive acts and practices.

81.    Defendant's common courses of conduct offend an established public policy of secure electronic money transfers in the marketplace, and constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers that is not

reasonably avoidable by the consumers nor outweighed by countervailing benefits to consumers or competition.

82.    Defendant's common courses of conduct caused injury to the business or property of Plaintiff and the Washington Class.

83.    Defendant's common courses of conduct have misled Plaintiff and the Washington Class and will continue to mislead them in the future.

84.    As a result of Defendant's unfair and deceptive practices, Plaintiff and the Washington Class have been damaged in amounts to be determined at trial and pursuant to RCW 19.86.090, Plaintiff and the Washington Class are entitled to recover such damages, including interest, as well as three times actual damages (up to $25,000), attorneys' fees and costs..

85.    Under RCW 19.86.090, Plaintiff and the Washington Class are entitled to an order enjoining Defendant BECU from engaging in the deceptive and unlawful acts and practices described herein.

86.    Plaintiff and the Washington Class are also entitled to additional equitable relief as the Court deems appropriate, including but not limited to disgorgement for the benefit of the Washington Class of all or part of ill-gotten gains Defendant has received in connection with the acts described herein.

## SECOND CAUSE OF ACTION
**Breach of Contract Including Breach of the Covenant of Good Faith and Fair Dealing**
**(Asserted on Behalf of the Classes)**

87.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

88.    Plaintiff and members of the Classes contracted with BECU for checking account services, as embodied in the Account Agreements and General Terms for BECU Funds Transfer Service.

89.     BECU breached the terms of its contract with consumers when as described herein, BECU failed to fairly investigatie reported fraudulent transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

90.     Further, under the law of each of the states where BECU does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

91.     This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

92.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

93.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

94.     Defendant breached the covenant of good faith and fair dealing when it failed to fairly investigate reported fraudulent transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

95.     Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

96.     Plaintiff and members of the Classes have performed all of the obligations imposed on them under the contract.

97.    Plaintiff and members of the Classes have sustained monetary damages as a result of BECU's breaches of the contract and covenant of good faith and fair dealing.

**THIRD CAUSE OF ACTION**
**Violation of the Electronic Funds Transfer Act ("EFTA")**
**15 U.S.C. §§ 1693, *et seq*.**
**(Asserted on Behalf of the Classes)**

98.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

99.    The Electronic Fund Transfer Act and Regulation E apply to electronic fund transfers that authorize a financial institution to debit or credit a consumer's account. 12 C.F.R. § 1005.3(a).

100.    The primary objective of the EFTA is "the protection of individual consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b).

101.    Defendant is a financial institution. 12 C.F.R. § 1005.2(i).

102.    "If a financial institution, within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. § 1693d(a), (c), or (d)] or notification pursuant to [15 U.S.C. § 1693d(d)] receives oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C. § 1693d(b)], the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred," the financial institution is required to investigate the alleged error. 15 U.S.C. § 1693f(a).

103.    After said investigation, the financial institution must determine whether an "error" has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. 15 U.S.C. § 1693f(a).

104.    A financial institution that provisionally recredits the consumer's account for the amount alleged to be in error pending an investigation, however, is afforded forty-five (45) business days after receipt of notice of error to investigate. *Id*. § 16993f(c).

105.   Pursuant to the EFTA, an error includes "an unauthorized electronic fund transfer." *Id*. § 1693f(f).

106.   An Electronic Fund Transfer ("EFT") is any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(b)(1). Accordingly, Regulation E applies to any person-to-person ("P2P") or mobile payment transactions that meet the definition of EFT. 12 C.F.R. §  1005.3(b)(1)(v); *id*., Comment 3(b)(1)-1.ii.

107.   Unauthorized EFTs are EFTs from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. § 1005.2(m).

108.   According to the Consumer Financial Protection Bureau, when a third party fraudulently induces a consumer into sharing account access information that is used to initiate an EFT from the consumer's account, that transfer meets Regulation E's definition of an unauthorized EFT.[5]

109.   In particular, Comment 1005.2(m)-3 of Regulation E explains that an unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through robbery or fraud. As such, when a consumer is fraudulently induced into sharing account access information with a third party, and a third party uses that information to make an EFT from the consumer's account, the transfer is an unauthorized EFT under regulation E. 12 C.F.R. § 1005.2(m), Comment 1005.2(m)-3.

110.   Here, Plaintiff and Members of the Classes were fraudulently induced by third-party scammers to make unauthorized money transfers from their BECU accounts.

---

[5] "Electronic Fund Transfers FAQs," Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/#financial-institutions-2 (last accessed June 6, 2022).

CLASS ACTION COMPLAINT -19-

111.    After the unauthorized EFTs were made, the EFTs appeared on the bank statements of Plaintiff and Members of the Classes.

112.    Plaintiff and Members of the Classes notified Defendant of these errors within sixty (60) days of their appearances on their accounts.

113.    As a direct and proximate result of Defendant's conduct, Plaintiff and Members of the Classes were unable to reclaim the account funds taken from scammers from unauthorized EFTs.

114.    Defendant knowingly and willfully concluded that the transfers of funds via Zelle on accounts of Plaintiff and Members of the Classes were not in error when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

115.    Defendant intentionally determined that the unauthorized transfer of funds via Zelle on accounts of Plaintiff and Members of the Classes were not in error due to, at least in part, their financial self-interest as a stakeholder in Zelle.

116.    Defendant refused to reverse or refund funds to Plaintiff and Members of the Classes.

117.    As such, Plaintiff and Members of the Classes are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of Defendant; and (iv) reasonable attorneys' fees and costs. *Id*. §§ 1693f(e)(2), 1693m(a)(2)(B)–(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A.    Certifying the proposed Classes, appointing Plaintiff as representative of the Classes, and appointing counsel for Plaintiff as lead counsel for the respective Classes;

B.    Declaring that Defendant's policies and practices as described herein constitute a breach of contract, and a breach of the covenant of good faith and fair dealing, violation of Washington's Consumer Protection Act and/or violation of the Electronic Fund Transfers Act.

C.    Enjoining Defendant from the wrongful conduct as described herein;

D.    Awarding restitution of all fees at issue paid to Defendant by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

F.    Awarding actual and/or compensatory damages in an amount according to proof;

G.    Punitive and exemplary damages;

H.    Awarding pre-judgment interest at the maximum rate permitted by applicable law;

I.    Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

J.    Awarding such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: July 5, 2022                                    Respectfully submitted,


                                                       **THE HARBOR LAW GROUP**

                                                       /s/ Kira M. Rubel
                                                       Kira M. Rubel, WSBA No. 51691
                                                       kira@theharborlawgroup.com
                                                       Maura S. McCoy, WSBA No. 48070
                                                       maura@theharborlawgroup.com
                                                       3615 Harborview Dr., Suite C
                                                       Gig Harbor, WA 98332

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis*
ashamis@shamisgentile.com
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (CA Bar No. 238293)*
*jkaliel@kalielpllc.com*
Sophia Goren Gold (CA Bar No. 307971)*
*sgold@kalielgold.com*
1100 15the Street NW, 4th Floor
Washington, D.C.  20005
Tel: (202) 350-4783

**EDELSBERG LAW, PA**
Scott Edelsberg*
scott@edelsberglaw.com
20900 NE 30th Ave Ste 417
Aventura, FL 33180
Tel: 305-975-3320

*Pro Hac Vice forthcoming*

*Attorneys for Plaintiff and the Putative Class*

# EXHIBIT 1

# United States Senate

### WASHINGTON, DC 20510

April 29, 2022

Al Ko
Early Warning Services, LLC
16552 N 90th St
Scottsdale, AZ 85260

Dear Mr. Ko,

We write regarding disturbing reports of a rise in fraud and scams on your online peer-to-peer money transfer platform Zelle, and the ongoing failure by Zelle or the banks that own this service to address these scams and provide appropriate redress to defrauded consumers. This "widespread fraud" on money transfer apps has affected nearly 18 million Americans.[1] Given the rise of increasingly sophisticated scams on your platform and the widely documented difficulties consumers have faced in seeking relief from banks, we seek to understand the extent to which Zelle allows fraud to flourish and the steps your company is taking to increase consumer protection and help users recover lost funds.

After its introduction in 2017, Zelle exploded in popularity, in large part because its connections to large financial institutions allowed it to sell itself as "fast, free, and ubiquitous."[2] Your company, Early Warning Services, LLC is owned by seven of the country's biggest banks, including JP Morgan Chase & Co., Bank of America, and Wells Fargo, giving consumers the convenience of an integrated platform and providing an implicit promise that activity on the platform is as secure as activity at the bank teller window.[3] In 2021, Zelle "drove $490 billion in transactions, more than double Venmo's $230 P2P volume."[4]

The increased activity on Zelle is putting millions of consumers at risk as fraud flourishes:

> Police reports and dispatches from industry analysts make it clear that the network has become a preferred tool for grifters like romance scammers, cryptocurrency con artists, and those who prowl social media sites advertising concert tickets and purebred puppies — only to disappear with buyers' cash after they pay.[5]

---

[1] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.
[2] New York Times, "Cash Faces a New Challenger in Zelle, a Mobile Banking Service," Stacy Cowley, June 12, 2017, https://www.nytimes.com/2017/06/12/business/dealbook/mobile-banking-zelle-venmo-apple-pay.html.
[3] Early Warning Services, LLC, website accessed Apr 25, 2022, https://www.earlywarning.com/about; New York Times, "Cash Faces a New Challenger in Zelle, a Mobile Banking Service," Stacy Cowley, June 12, 2017, https://www.nytimes.com/2017/06/12/business/dealbook/mobile-banking-zelle-venmo-apple-pay.html.
[4] American Banker, "Can Zelle change the narrative around P2P fraud?," Kate Fitzgerald, March 9, 2022, https://www.americanbanker.com/payments/news/can-zelle-change-the-narrative-around-p2p-fraud.
[5] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

Reports of consumers losing thousands of dollars have come out of California,[6] Massachusetts,[7] and Georgia.[8] These scams, many of which involve a scammer creating a Zelle account linked to the consumer's own phone number, have cost victims their life savings and robbed them of funds essential to their small businesses, further underscoring the consequences of this widespread fraud.[9]

Alarmingly, both your company and the big banks who both own and partner with the platform have abdicated responsibility for fraudulent transactions, leaving consumers with no way to get back their funds. Zelle's biggest draw – the immediacy of its transfers – also makes scams more effective and "a favorite of fraudsters," as consumers have no option to cancel a transaction even moments after authorizing it.[10] And banks have chosen to let consumers suffer, blaming them for authorizing fraudulent transactions.[11] According to Consumer Watchdog, banks were essentially "throw[ing] up their hands and say 'it's not our problem because you authenticated it.'"[12] A former executive at your company even argued that banks have not done enough to deter fraud on Zelle, warning that banks had not sufficiently educated consumers about the risks.[13] One customer observed that "it's like the banks have colluded with the sleazebags on the street to be able to steal."[14]

The policies of your company and the banks that own and operate on it create a confusing and unfair environment for consumers, who are already facing "rampant" and sophisticated threats from spammers on the platform.[15] The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act protected victims of fraudulent money transfers, including those who were "induced" into transferring the money themselves,[16] while the FDIC issued a report in March 2022 finding that both the banks and the platform – in

---

[6] ABC 7 News, "LA woman loses over $18K through 'Zelle' after scammers text, call her pretending to be bank," Carlos Granda, March 12, 2022, https://abc7.com/los-angeles-zelle-scam-text-message/11644167/.

[7] Boston 25 News, ""They're not robots talking to you. They're actual people." Zelle app users warn of latest scams," Chris Flanagan, March 23, 2022, https://www.boston25news.com/news/massachusetts/theyre-not-robots-talking-you-theyre-actual-people-zelle-app-users-warn-latest-scams/WJZVXE23JZFCTPBD5XOPZZXF6I/.

[8] WBS-TV, "Zelle warns about scams, says it's not responsible for funds stolen through app," Ashli Lincoln, March 28, 2022, https://www.wsbtv.com/news/local/zelle-warns-about-scams-says-its-not-responsible-for-funds-stolen-through-app/ZTCNAVOTTNG5RNTAOAXPWELXB4/.

[9] Id.

[10] KARE 11, "Two Minnesota women were tricked by the same scam on Zelle, here's how you can protect yourself," Gordon Severson, March 22, 2022, https://www.kare11.com/article/money/minnesota-women-tricked-by-the-same-scam-on-zelle-heres-how-you-can-protect-yourself/89-3016a498-c8db-407a-ab1f-632f24204d9a; New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

[11] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

[12] ABC 7, "Calif. woman loses over $18K through 'Zelle' after scammers text, call her pretending to be bank," Carlos Granda, March 14, 2022, https://abc7news.com/zelle-scam-electronic-withdrawals-bank-of-america/11650620/.

[13] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

[14] Id.

[15] Id.

2

this case Zelle – were held responsible for fraudulent electronic transfers through Regulation E.[17] Given this regulatory landscape, your company and the banks have a clear responsibility to more aggressively protect consumers.

In order to better understand how consumers have experienced fraud on your platform we ask that you provide answers to the following questions by May 13, 2022:

1. What are the procedures for rooting out scams on the online platform Zelle, and how has your company adjusted those procedures in light of "rampant […] organized crime"[18] on the platform?
2. What are Zelle's policies for determining which consumers receive refunds for fraudulent claims?
   a. Is this a joint process with the account holders' bank? If so, are these procedures standardized across all banks and financial institutions using the platform?
3. Does Regulation E of the Electronic Fund Transfers Act apply to the scams seen regularly on Zelle, including those that involve consumers induced into authorizing fraudulent transfers?
   a. Under Regulation E, would Early Warning Services, LLC or the account holders' bank be responsible for refunding the funds?
4. How many reports of fraud from Zelle customers have Early Warning Services received for each of the last five full calendar years, and from January 1, 2022, to the present? For each year, and for the period from January 1, 2022, to the present, please provide:
   a. The total number of reported cases of fraud from Zelle customers.
   b. The total dollar value of reported fraud.
   c. The number of cases where Zelle provided refunds to customers.
   d. The total value of these refunds.
   e. The number of cases where Zelle referred fraud to law enforcement or to federal or state bank regulators,

Thank you for your attention to this matter.

Sincerely,

---

[16] Boston 25 News, ""They're not robots talking to you. They're actual people." Zelle app users warn of latest scams," Chris Flanagan, March 23, 2022, https://www.boston25news.com/news/massachusetts/theyre-not-robots-talking-you-theyre-actual-people-zelle-app-users-warn-latest-scams/WJZVXE23JZFCTPBD5XOPZZXF6I/.

[17] Consumer Finance Monitor, "FDIC Consumer Compliance Supervisory Highlights looks at unauthorized EFTs, overdraft programs, re-presentment of unpaid transactions, and fair lending," John L. Culhane, Jr., April 7, 2022, https://www.consumerfinancemonitor.com/2022/04/07/fdic-consumer-compliance-supervisory-highlights-looks-at-unauthorized-efts-overdraft-programs-re-presentment-of-unpaid-transactions-and-fair-lending/.

[18] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

Elizabeth Warren
United States Senator

Robert Menendez
United States Senator

Jack Reed
United States Senator